Morris and Jennie Sandler v. Commissioner. Fannie Sandler v. Commissioner. Isidore Schramm v. Commissioner. Morris and Jennie Sandler v. Commissioner.
Sandler v. Commissioner
Docket Nos. 57015-57017, 57021.
United States Tax Court
T.C. Memo 1958-47; 1958 Tax Ct. Memo LEXIS 177; 17 T.C.M. (CCH) 242; T.C.M. (RIA) 58047; March 31, 1958
*177 Morris A Kaplan, Esq., and Oscar Hanigsberg, C.P.A., 52 Broadway, New York, N. Y., for the petitioners. Martin D. Cohen, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion Respondent made the following determinations of deficiency in income tax: Additions
Sec.
Sec.
Year
Deficiency
293(b)
294(d)(2)
Morris and Jennie Sandler
1946
$45,451.04
$22,809.72
$2,692.87
1947
50,337.53
25,559.59
3,062.05
1948
183.04
Fannie Sandler
1947
14,160.24
7,458.43
895.25
1948
204.33
Isidore Schramm
1947
14,851.62
7,821.95
931.55
Concessions by the parties have narrowed the issues so that two questions remain to be decided. They relate to the 1946 income tax of Morris and Jennie Sandler and are: Did Morris Sandler in 1946 receive $43,277 in cash payments with respect to over-ceiling sales which he failed to report on the joint return filed by him and his wife for that year, and, if he did, was his failure to report due to fraud? A further issue relating to the amount, if any, of any addition pursuant to Section 294(d)(2) can be disposed of under Rule. 50. Findings of Fact Some of the facts have been *178 stipulated and are incorporated herein by reference. Morris Sandler (hereinafter referred to as petitioner or Sandler) and Jennie Sandler are husband and wife; at all times relevant to this proceeding they have resided in Brooklyn, New York. Jennie Sandler is involved herein because she filed a joint return with petitioner for the year 1946. Petitioner entered the sugar business in about 1930 or 1931. In 1933 he and his brother-in-law, Isidore Schramm (hereinafter referred to as Schramm), formed a partnership to carry on the sugar business. The business was incorporated in 1936 under the name of the Quaker Sugar Co., Inc. Petitioner and Schramm each owned 50 per cent of the stock of this corporation. In 1937 the corporation was dissolved and petitioner, his father, and Schramm organized a partnership to continue the business. Each partner owned a one-third interest in the business. In 1945, when petitioner's father was seriously ill, the partnership was changed to include petitioner's mother, Fannie Sandler, as the third equal partner along with petitioner and Schramm. The partnership was called the Quaker Sugar Co. (hereinafter referred to as Quaker). Quaker's chief business *179 was that of jobbing sugar and specialty grocieries. Its place of business, at 351 Franklin D. Roosevelt Drive, New York, consisted of a warehouse and a one-room office. Petitioner purchased all of the sugar for Quaker, was the firm's only outside salesman, and did some work in the office. Schramm supervised the operations in the warehouse, and Fannie Sandler, who in 1956 was 65 years of age, did not actively participate in the partnership business. Anna Levitan (hereinafter referred to as Anna) is employed by Quaker as secretary-bookkeeper. She has been continuously employed in that capacity by Quaker since 1942. In the course of her job she maintained the books and records of Quaker, made sales over the telephone and dealt with customers that came to the office. Anna is, and was during 1946, Quaker's only office employee. Since 1933 David Duboff, an accountant, has done accounting work for Quaker. He made monthly audits of the records kept by Anna, and prepared the tax returns for the partnership and the partners from these records. During 1946 the Office of Price Administration (hereinafter referred to as the O.P.A.) supervised the pricing and rationing of sugar. To facilitate *180 transactions involving ration points tradesmen were permitted to open ration accounts in banks. These accounts represented deposits of O.P.A. allotments of ration coupons or ration coupons received by the tradesmen from their customers. Ration accounts could be drawn against by tradesmen in meeting the ration point needs of their own purchases. They were drawn against much in the way that currency checking accounts are drawn against. (For convenience the instrument used to draw against a ration account will be referred to as a ration check.) Early in 1946 Alan Shapiro (hereinafter referred to as Shapiro) became the owner of the A & G Grocery Co. in New York City. Beginning in February 1946 Shapiro was a customer of Quaker. At about the time that Shapiro became the owner of the A & G Grocery Co. he was approached by Sidney Morgenbesser (hereinafter referred to as Morgenbesser), with whom he had conducted some prior business, and Irving Schwartz (hereinafter referred to as Schwartz). Morgenbesser and Schwartz were co-conspirators with certain members of the staff of the O.P.A. These conspirators had worked out a scheme for obtaining sugar and selling it at prices higher than those *181 fixed by the O.P.A. Morgenbesser and Schwartz told Shapiro that they had just gone into business under the name of Boro Food Co., and inquired whether Shapiro knew a source of supply for their sugar needs. Shapiro undertook to determine whether Sandler would be willing to supply them. Sandler agreed to supply the Boro Food Co. with sugar, and in return Shapiro agreed to pay Sandler $2.00 over the ceiling price for every 100 pounds sold. This agreement between Sandler and Shapiro was made after Sandler had occasion to meet Morgenbesser and Schwartz. The mechanics of the transactions involving Quaker and Boro Food Company were as follows: Morgenbesser or Schwartz would deliver to Shapiro a ration check, a currency check to cover the cost at ceiling prices of sugar in the amount of the ration check, and $2.25 in cash for every 100 pounds of sugar to be purchased. Shapiro would then deliver the ration check, the currency check and $2.00 in cash for every 100 pounds of sugar purchased to Sandler. Sandler would record the transaction at the ceiling price on a Quaker invoice, and give Shapiro the authorization (referred to as a pick-up slip) necessary for loading the sugar which was *182 not ordinarily at the Quaker warehouse but was in the possession of Quaker's suppliers. Shapiro would then turn the pick-up slip and Quaker's bill in the amount of the ceiling price for the sugar over to Morgenbesser or Schwartz; he would keep for himself $.25 for each 100 pounds purchased. During the period March 25, 1946 through April 3, 1946 Boro Food Co. purchased 230,000 pounds of sugar from Quaker. During this period Shapiro paid $4,600 in cash to Sandler in addition to the ceiling price for the sugar. The $4,600 in cash was not entered in Quaker's books, and was not reported on either Quaker's or petitioner's tax returns. Boro Food Co. did not have sufficient ration points in its ration account to cover the ration checks drawn for its purchases from Quaker. When the ration account was overdrawn in a certain amount, the conspiratorial members of the O.P.A. staff indicated to Morgenbesser and Schwartz that a new account should be used to furnish ration checks for these transactions. Consequently Morgenbesser and Schwartz asked Shapiro if he would be willing to overdraw his own ration account to facilitate these transactions. They assured him that their O.P.A. friends would *183 limit his penalty to a short suspension, and would relieve him of potential sanctions with respect to some prior transactions involving counterfeit ration coupons. Shapiro had deposited counterfeit ration coupons in his ration account, and, although he contended that he was ignorant of their counterfeit nature, he was fearful of the possible consequences. Shapiro agreed to use his A & G Grocery Co. account for the purposes outlined above, and during the period May 9, 1946 through May 24, 1946, purchases of 223,500 pounds of sugar from Quaker were made in which A & G Grocery Co. was the nominal purchaser. The mechanics of the transactions involving A & G Grocery Co.'s ration account were as follows: Shapiro would receive instructions as to the amount of sugar to be purchased. Along with these instructions he would receive between $15 and $16.50 in cash, usually from a "runner", for every 100 pounds of sugar to be purchased. Shapiro would deposit money in his checking account sufficient to pay for the projected purchase at the ceiling price, which was then approximately $6.28 per hundred pounds. He would then draw a ration check and a currency check equal to the amount just deposited *184 and turn them over to Sandler along with $2 in cash for every 100 pounds so purchased. Sandler or Anna would record the purchase on a Quaker invoice at the ceiling price, and would give Shapiro the invoice and a pick-up slip for the sugar. Shapiro would keep $1 of the money delivered to him for every 100 pounds of sugar purchased and the Quaker bill showing the correct ceiling price for the purchase. He would turn what was left of the money and the pick-up slip over to Morgenbesser, Schwartz, or someone acting in their behalf. From May 9, 1946 through May 24, 1946, Sandler received $4,470 in cash from Shapiro in connection with purchases of sugar made during this period. Sandler did not record these payments on Quaker's books, and they were not reflected either on Quaker's or on his own income tax returns. During this period Shapiro was also overdrawing his ration account on behalf of the same conspirators for purchases from other sources. When his account was overdrawn to the extent of approximately 400,000 pounds the conspirators decided that a new account was needed. Shortly thereafter the O.P.A. informed Shapiro that he was suspended from dealing in sugar for the duration of *185 the rationing period. Isidore Shapiro was Alan Shapiro's brother-in-law. In 1946 Isidore Shapiro and his father owned Service Dairies Inc. Shortly after Alan Shapiro stopped drawing on his ration account he made an arrangement with Isidore Shapiro whereby the account of Service Dairies Inc. would be used to continue the black market scheme. During the period June 28 through July 11, 1946, Service Dairies was the nominal purchaser of 482,800 pounds of sugar from Quaker. The transactions were in many ways similar to those using the A & G Grocery Co. ration account. The major differences were that the currency and ration checks were drawn by Service Dairies Inc., and the dollar per hundered pounds, formerly kept by Alan Shapiro, was given to his brother-in-law. In connection with the purchases of Service Dairies Inc. Alan Shapiro gave Sandler $9,656 in cash during the period June 28 through July 11, 1946. Sandler did not record this amount on Quaker's books and it was not reflected on Quaker's or Sandler's income tax returns. Neither before nor after the transactions described above did Quaker sell sugar to the Boro Food Company or Service Dairies, Inc. Quaker did not sell sugar *186 to the A & G Grocery Co. after May 24, 1946. Edward Goroff (hereinafter referred to as "Goroff") was the owner of the Paul Trucking Company. He had done some trucking for Quaker prior to 1946, and was friendly with Sandler. Sometime before June 28, 1946, Goroff agreed to take part in a scheme designed to sell sugar at prices above those fixed by the O.P.A. The same employees of the O.P.A. that were connected with the black market scheme involving Shapiro were also connected with the scheme involving Goroff. The general outline of the black market scheme involving Goroff was as follows: The conspiratorial O.P.A. employees would convince various grocers to agree to overdraw their ration accounts in order to obtain sugar for sale to some ultimate purchaser. These grocers were mere conduits. When Goroff and a grocer were informed of a black market sale to be made to an ultimate purchaser, the grocer would draw a ration check on his own account in the amount of the sale and turn it over to Goroff. Goroff, in turn, would take it to Quaker, and receive a pick-up slip for the amount of the sugar covered by the ration check. The transaction would be billed at the ceiling price to the grocer *187 who drew the ration check. Goroff, using the pick-up slip, would load the sugar in his own truck and deliver it to the actual purchaser. The time of Goroff's pick-up depended on the availability of the sugar (or, in some cases, the sugar syrup) at Quaker's suppliers. Pick-ups were not always accomplished on the same day that Goroff received pick-up slips. Soon after delivery to the real purchaser Goroff would receive payment from that purchaser in an amount greater than the price fixed by the O.P.A. If payment was by check Goroff would cash it, and soon after receiving payment would turn over cash in the amount of the ceiling price of the purchase to the grocer who drew the ration check. The next step in the transaction was the payment to Quaker of the ceiling price of the sale. This was usually done by a check drawn by the grocer who had been billed for the sale. This check was in many cases delivered to Quaker by Goroff. Additionally Goroff paid Sandler $1 for every 100 pounds dryweight of sugar sold in this manner. Goroff turned the remaining money over to the O.P.A. conspirators and they, in turn, paid him. From June 28, 1946 through November 16, 1946, Goroff was the intermediary *188 for sales consummated in the foregoing manner, using ration checks drawn by the following grocers in the following amounts: Pounds Sold,
Period
Grocer
Dryweight
of Sales
Nel-Ben Dairy, Inc.
587,189
6/28- 7/31/46
President Grocery &
Dairy Co.
629,919
7/26- 8/22/46
Lexington Fruit Shop
460,700
8/15- 9/25/46
Braunstein Bros.
562,840
9/25-11/16/46
Super Shop
214,464
11/ 1-12/12/46 The amounts, in cash, paid by Goroff to Sandler in 1946 in excess of the ceiling price in connection with these sales were: Amount
Nel-Ben Dairy, Inc.
$5,872
President Grocery and Dairy Co.
6,299
Lexington Fruit Shop
4,607
Braunstein Bros.
5,628
Super Shop
2,145
Quaker did not sell sugar to these grocers after the period set out above alongside their names. Sandler did not record any of the foregoing cash payments on Quaker's books, and they were not reported on Quaker's or petitioner's income tax returns. On March 4, 1952, Sandler was adjudged guilty, after a trial by jury in the United States District Court for the Southern District of New York, of conspiring "to defraud the United States of a governmental function in connection with *189 the rationing of sugar and of the honest and faithful services of employees of the Office of Price Administration". The indictment leading to this judgment listed, among others, Goroff, Shapiro, Morgenbesser, Schwartz and certain employees of the O.P.A. as petitioner's co-conspirators. Petitioner was sentenced to two years' imprisonment. His conviction was reversed by the United States Court of Appeals for the Second Circuit on the ground that the indictment, which was returned March 31, 1950, was untimely. The Supreme Court affirmed the judgment of the Second Circuit in a per curiam opinion by an equally divided court. Petitioner has not consented to extending the time during which respondent can assess tax in regard to the year 1946. Petitioner Morris Sandler filed a fraudulent income tax return for 1946 with intent to evade tax. Part of the deficiency for that year is due to fraud with intent to evade tax. Opinion RAUM, Judge: The principal issue is one of fact, namely, whether the controverted over-ceiling cash payments were in fact made to Morris Sandler. The trial was a lengthy one, and we heard much testimony in this connection. Sandler denied having received any such *190 payments. On the other hand, two witnesses, Shapiro and Goroff, testified at length as to sales in which they were intermediaries. The evidence was overwhelming that in the sales in which Shapiro participated not only did Quaker receive checks in the full amount permissible under O.P.A. ceilings but Sandler in addition received a cash premium of $2 per hundred pounds of sugar. In the case of the sales handled by Goroff a similar pattern was followed, but the premium was $1 a 100 pounds. Notwithstanding petitioner's effort to discredit their testimony through certain evidence presented by Quaker's secretary-bookkeeper, Anna Levitan, we have found the testimony of Shapiro and Goroff in all essential respects credible, strong and persuasive. We accept it as reliable. The evidence discloses an elaborate scheme to evade the O.P.A. laws. Petitioner Morris Sandler in 1946 received the cash payments for his part in the scheme. They were kept secret and were not reported on his returns. The conclusion is irresistible on this record that his failure to report these payments was deliberate and due to fraud with intent to evade tax. [1] Cf. , affirmed, *191 (C.A. 2), certiorari denied, ; . Decisions will be entered under Rule 50. Footnotes
1. Although our conclusion is fortified by evidence as to petitioner's conviction (reversed on appeal on grounds other than the merits) in a criminal conspiracy case with respect to the transactions now before us, we have nevertheless reached that conclusion without relying upon such evidence.↩